# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 13-259 (JRT/LIB) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR JUDGMENT OF ACQUITTAL** |
| JAMES WHITE, JR., | |
| Defendant. | |

---

Diedre Y. Aanstad, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for plaintiff.

Peter B. Wold, **WOLD MORRISON LAW**, 247 Third Avenue South, Minneapolis, MN 55415, for defendant.

On August 30, 2013, ten-month-old A.W.[1], suffered serious injuries resulting in seizure and was ultimately airlifted from his local hospital on the Red Lake Indian Reservation to a larger hospital in Fargo, North Dakota. A.W. was alone with his father, Defendant James White, for a ten-minute period during which the first symptoms occurred. Several days later, James White was arrested and ultimately indicted for assault resulting in serious bodily injury under 18 U.S.C. § 113(a)(6). The case proceeded to trial and the jury found White guilty. White now brings a motion for judgment of acquittal, requesting that the Court overturn the jury's verdict for lack of sufficient evidence to support a conviction beyond a reasonable doubt. The Court will

---

[1] The Court will refer to the victim, a minor, by his initials.

grant the motion and overturn the jury's verdict because it concludes that, viewing the evidence in a light most favorable to the government, the totality of the circumstantial evidence is insufficient to support a finding beyond a reasonable doubt that White caused A.W.'s injuries.

## BACKGROUND

### I.   A.W.'S FAMILY AND BACKGROUND

Defendant James White is the father of A.W., an infant who was ten months old in August 2013.  (Tr. 93:2-10; 103:8-11; 242:16-18, Apr. 2, 2014, Docket Nos. 67-70.)[2] The mother of A.W., Cheryl Maxwell, has four other children: another son with White born in 2011 – X.W., a girl born in 2004, a boy born in 2005 – J.S., and a girl born in 2007; the older three children have a different father, who committed suicide in August 2009.  (Tr. 102:11-103:11; 92:6; 94:22-97:7; 101:17-22.)[3]  At the time of the incident giving rise to the indictment, White lived with Maxwell, and although she was the primary caregiver for her children, he would take care of them for her "once in a while," such as when she had to go to an appointment or to meet with someone.  (Tr. 104:13-105:4.)  Maxwell, an enrolled member of the Red Lake Indian Reservation, lives on the reservation in Redby, MN.  (Tr. 90:25-91:2; 33:7-11.)

---

[2] The trial transcript is filed on the docket in four volumes with four separate docket entries: Volume I at Docket No. 67, Volume II at Docket No. 68, Volume III at Docket No. 69, and Volume IV at Docket No. 70.  The entire transcript is consecutively paginated, and this Order will cite to the entire transcript using the internal, consecutive pagination.

[3] Where necessary, the Court will refer to all of the minor children referenced in the trial testimony by their initials and will not note the alteration when used in quotations.

## II.      EVENTS OF AUGUST 30, 2013

Much of the testimony at trial centered on the events that occurred on and after August 30, 2013.  Maxwell testified that on that day, two of the older children were playing outside and she was inside with White, A.W. and X.W.  (Tr. 113:8-13.)  She testified that the older girl and boy "were in and out of the house that whole day." (Tr. 113:24.)  She said she made rice soup for dinner and that everyone sat at the table eating the soup, including White and A.W., who was in a highchair, and that at the time he seemed fine – there was nothing about him that was unusual.  (Tr. 114:2-7; 114:11-24.)  She said that after he ate he was tired and rubbing his eyes.  (Tr. 115:3-4.)

After dinner, she went with the older children to walk to her cousin's house to try to get a ride to the store, leaving White at home with A.W. to put him to bed. (Tr. 115:24-116:11.)  She testified that "he liked to be rocked when he'd go to sleep, so we would rock him in his carseat" and that White said he was going to put A.W. to sleep: "he would always put the boys to sleep.  He would put X.W. to sleep, and he would put A.W. to sleep . . . in his carseat."  (Tr. 118:3-19.)  Nobody answered at her cousin's house, so they returned back to the house and "were only gone ten minutes . . . . And that's when I thought A.W. was choking. . . . [W]hen I came walking back, James was holding A.W. and he told me to call help and I panicked.  I grabbed the phone [and] called 9-1-1 . . . ."  (Tr. 115:24-116:11.)  She explained that White opened the door and "told me to come help him, A.W. was choking.  And when I went in there, I got scared. It looked like A.W. was choking because he had a little bit of rice coming out of his mouth and a little bit out of his nose.  And that's what I told the dispatcher, I thought he was choking.  I didn't know he was having a seizure until we got up to the Red Lake

- 3 -

Hospital." (Tr. 118:22-119:15.) She testified that White was doing CPR on A.W., and that when he "blew in his mouth a little bit . . . it seemed like more of that rice came out." (Tr. 121:9-14.) She called 9-1-1 as soon as she got inside. (Tr. 120:18.)

Red Lake Department of Public Safety Patrol Officer Guadalupe Ybarra was the first to arrive. (Tr. 31:25-32:6; 32:19-33:6.) She found White holding the child; she described the baby's condition as "[v]ery limp, not – he didn't appear to be breathing, just not coherent." (Tr. 37:22-38:5.) White told her immediately that he thought the baby "was choking [and] [h]e didn't know if he was choking on hamburger or rice that he had been fed earlier" and that he suggested A.W. could have been choking on a cigarette butt. (Tr. 39:18-20; 41:2-5; 45:3-14.) She looked around but did not see anything on the floor that the baby could have been choking on. (Tr. 41:10-15.) Ybarra testified that to her, "it didn't appear he was choking because he was so limp," but she still "attempted to do CPR." (Tr. 39:23-25.) She looked for other injuries on the baby but found no bruises on his legs, back, arms, ears, eyes or head. (Tr. 46:7-24; 50:1-9.) Red Lake Tribal Police Department Captain Dana Lyons, Jr. arrived while Officer Ybarra was administering first aid. (Tr. 52:3-8; 55:11-19.) He testified that "White came up and . . . basically told us the story of what happened, told us that the child was eating hamburger, rice, and all of a sudden the kid started choking and he stopped breathing. So, James basically told me that he tried to get the object out of the child's throat or the mouth area, and he tried to administer – or do something to try to get the child to start breathing again." (Tr. 55:11-19.) Captain Lyons testified that "I always check around to see if there's objects laying on the ground that maybe something could have swallowed. And also checked the baby for bruisings or anything. I didn't see anything present at the time." (Tr. 55:21-24.)

When asked if he saw anything "that would indicate that the child had vomited," he stated that he believed there was vomit on White's shirt.  (Tr. 56:4-10.)

The three of them – White, Ybarra, and Lyons – continued to perform CPR until the ambulance arrived and the EMTs took over, which according to Ybarra was "maybe two, three minutes."  (Tr. 42:2-10.)  Ybarra drove the ambulance while the EMTs, A.W., and Maxwell rode in the ambulance and White stayed at the house.  (Tr. 42:14-43:3.)  Upon arrival at the Red Lake Indian Health Service Hospital, A.W. was seen in the emergency room by Dr. Randall Fryer.  (Tr. 63:10-11, 65:21-23, 67:5-8.)  As soon as Dr. Fryer saw A.W. he asked the charge nurse to call for a helicopter "[b]ecause I knew right away that the child needed a higher level of care than I could provide . . . [or that] the secondary hospital 30 miles away was going to be able to provide."  (Tr. 68:5-12.)

After having the charge nurse call for a helicopter, Dr. Fryer did an initial examination and observed that "[t]he child was still seizing, and a seizure that had gone on . . . for a prolonged period of time can become dangerous in and of itself," such that there is "a concern about the airway," that they might breathe in their vomit.  (Tr. 69:22-70:20.)  Dr. Fryer sought information about what could have happened with the child, and learned that "there were a number of different things that the mother presented as possibilities for what was going on.   And when things are that tense, that's not completely uncommon for the parent to be grasping at, it could be this, it could be that."  (Tr. 72:10-14.)  He checked the child over and observed that "[t]he thing that was most concerning to me were the unequal pupils.  The right pupil was dilated, the left pupil was constricted."  (Tr. 72:22-24.)  At the time, he was "concerned the child was going to die on [him]" because of the unequal pupils, a seizure that was not calming down, and the

fact that they had used a strong sedative but the first dose did not stop the seizure. (Tr. 74:11-16.)  When the helicopter arrived, the emergency team from the helicopter was able to intubate the child and he was taken away paralyzed by medications and intubated. (Tr. 78:3-9.)   Dr. Fryer's encounter with the child lasted approximately twenty-five minutes.  (Tr. 78:10-11.)

## III.   MEDICAL TREATMENT IN FARGO

At Sanford Medical Center ("Sanford") in Fargo, ND, A.W. was seen in the emergency room and a CT scan and other imaging was done; he was then transferred to the Pediatric Intensive Care Unit where he was seen by Dr. Kenneth Gheen, a pediatric critical care physician.  (245:22-246:14; 240:24-241:4.)  Among other things, Dr. Gheen observed bruising on A.W.'s forehead and right ear.  (Tr. 255:7-11.)  Staff neurosurgeon Dr. Adam Jackson was on call and examined both the imaging results and A.W. himself. (Tr.  188:23-25;  189:18-25;  193:9-10,  196:16-20.)   In his review of the CT scans, Dr. Jackson observed "[i]nterhemispheric fissure between the two lobes of the brain had the density consistent with acute blood" (Tr. 197:2-4), meaning that the blood would have been deposited "[u]sually within three hours of injury, up to three days or so . . . but within three hours at the least" (Tr. 197:16-20).  At trial he referenced a CT image of A.W.'s brain and explained that there was acute blood between the lobes of the brain and acute blood on the right side between the brain and the skull extending all the way to the back.  (Tr. 199:21-200:11.)  The interhemispheric acute blood and blood on the right side between the skull and the brain were visible in scans at multiple levels of the brain (i.e. closer and farther from the top of A.W.'s head).  (*See* Tr. 201:11-202:17.)  He explained

that this indicated that much of the right side of A.W.'s head would have had acute blood. And that to get into the interhemispheric fissure, it has to come out of the vascular system and that for young children it most likely does that through trauma – "the child striking its head, a car accident, some sort of trauma." (Tr. 203:2-15.) He testified that he cannot, based on the CT, determine how the injury or trauma occurred, but that trauma was the "most likely explanation" for the acute bleeding, which he also referred to as "spontaneous subdural hematoma." (Tr. 203:21-204:2.) A "subdural hematoma" is blood in the "subdural space" – between the skull and the brain. (Tr. 210:10-13.) He again testified that for the acute bleeding to appear on the CT scan, the trauma would have had to occur anywhere between three hours and three days before the scan, as it takes some time to clot and become visible, but that he could not determine with any more precision when the cause of A.W.'s bleeding occurred. (Tr. 204:3-15.) He stated that he could not tell where the blood was coming from, and that "[i]t could be the underlying brain injury that causes the seizure injury, or it could be irritation of the brain by the blood, as we talked earlier. Both of those can happen," but that he could not determine definitively which caused A.W.'s seizure. (Tr. 215:8-19.)

## IV.   CHILD ABUSE INQUIRY AT SANFORD

In addition to Dr. Jackson, another physician, one who specializes in child abuse pediatrics, was called in to A.W.'s case. (*See* Tr. 249:11-23; 343:16-17.) Dr. Arne Graff, a physician with a subspecialty in child abuse pediatrics was called into the case because "[t]here were findings by the hospital staff that were concerning for non-accidental trauma, and so they requested a consult to get our opinion." (Tr. 343:16-17; 349:16-20.)

- 7 -

He explained at trial that his role is "to examine a child and look at injuries that may be present and then help determine from the medical point of view whether or not there is a medical reason; an accidental reason; or a non-accidental, abuse-type of cause for the injuries we're looking at." (Tr. 347:5-10.) He spoke with another doctor who had been treating A.W., examined A.W., and spoke with Maxwell, tribal law enforcement, and White as part of his investigation. (Tr. 351:6-13.)

Dr. Graff testified that in his separate conversations with Maxwell and White, each described a few recent incidents as possible causes of A.W.'s injuries. First, both described an incident the night before the August 30, 2013 incident in which White was giving A.W. a bath and he slipped out of White's hands and hit his chin on the bathtub, which left some bruises on A.W.'s chin and shoulder. (Tr. 355:9-13; 360:9-361:5.) They also discussed Maxwell's older son, eight-year-old J.S., as having a history of injuring A.W. Dr. Graff testified that Maxwell told him that there was an incident in which A.W. was in a bouncing chair that hung from a door frame (a "Johnny Jumper") and that J.S. "must have wound it up a little bit and let it twirl and that the patient had hit his head on the door jamb," but that A.W. had been "perfectly fine since that time," which was almost a week before the August 30 event. (Tr. 354:20-355:4.) White also "expressed some concerns about the older son . . . about [him] potentially choking the infant and dragging him around," (Tr. 359:7-9) but Dr. Graff testified that "there was no indication that any accidents or any rough behavior had occurred that was witnessed by [White] that day" (Tr. 359:12-14).

Dr. Graff also heard from both parents their versions of what occurred on August 30. He testified that Maxwell said "that she had come home after about

10 minutes.  The infant had looked perfectly fine when she left.  She described the infant

as being motionless.  And when they got to the hospital, she noticed bruising to the ears

that she had not previously noticed."  (Tr. 355:23-356:2.)[4]  Dr. Graff testified that White

explained that Maxwell had just finished feeding A.W. and gone next door, and that he

> took the infant from the highchair and put him in that carseat and gave him
> a bottle to work on.  And a short time later, he was apparently in a different
> room, stated that he heard some gasping, went in to check and see what was
> going on with the infant.  He told me that he had done a finger sweep and
> found a cigarette butt in the infant's mouth.  The infant was obviously in
> distress.  And he went outside, saw the mother, urged her to call 9-1-1, and
> then law enforcement showed up.

(Tr. 359:22-360:6.)

As part of this potential child abuse inquiry, a social worker at Sanford, Valerie

Hanson, was also consulted.  (Tr. 217:12-16, 220:15-17.)  She was called in to A.W.'s

case because it "was reported that there was multiple bruisings to this child, and it was

unknown, and bleeding in the brain that they wanted me to assess with the families if I

could discern what happened with this child."  (Tr. 220:19-22.)  She met with both

---

[4] Maxwell testified at trial that, at Sanford, Dr. Gheen asked her about the bruising inside A.W.'s ears and she said that she did not know how they got there, but that they had been there for "a couple days."  (Tr. 139:13-22; 140:23-141:16.)  The government mentions Maxwell's observations of A.W.'s bruises at Sanford for the first time as supportive of the guilty verdict, (Government's Opp'n to Mot. for J. of Acquittal at 7, Apr. 7, 2014, Docket No. 71 ("Maxwell did not . . . observe any bruising on the child.")), but that conclusion is not supported by the testimony at trial, particularly given that it was undisputed at trial that the bruise on A.W.'s forehead from when J.S. threw a toy at him was present before August 30, 2013 (*see* Tr. 136:20-139:4 (Maxwell explaining the source of the forehead bruise); 368:6-14 (Dr. Graff comments that the thrown toy explanation for the forehead bruise is "plausible")).  Furthermore, the government's medical expert Dr. Graff testified that bruises cannot be "dated," meaning that doctors cannot tell from a bruise alone when an injury occurred.  (*See* Tr. 365:14-24; 369:4-9.)  The government does not offer further explanation as to how the various pieces of testimony regarding A.W.'s bruises support a guilty verdict, so the Court does not consider them to be dispositive in its consideration of the sufficiency of the evidence.

Maxwell and White for a comprehensive social history, in which she learned of some stressors for the family but no allegations of prior abuse. (Tr. 222:13-15; 225:13-18.) In addition to the bathtub incident, (Tr. 227:3-8) they also told her about J.S., who she described as "a son that they had a lot of difficulty controlling and managing his behaviors" (Tr. 226:7-10). During the interview, White said he "thought it was possibly attributed to their other son in the home that had the behavioral problems because the other son had – was very – he said very rough on the other two youngest children," and mentioned that J.S. had thrown a toy at A.W.'s head but Hanson did not recall when White thought that had happened. (Tr. 228:8-19.) White also told Hanson that "the older child would – the baby or the patient would be in a jumper in a doorway, and the older child would take the baby and swing it back and forth where he'd be hitting against the door frame." (Tr. 229:1-4.) Maxwell also spoke about her older son's medications and behaviors that were difficult to manage. (Tr. 229:18-230:1.)

## V.    EXPERT TESTIMONY AT TRIAL

Both White and the government presented expert witnesses to testify to the medical causes of A.W.'s injuries.

### A.    Dr. Graff

The government's expert was Dr. Graff, the child abuse pediatrician who was consulted on A.W.'s case at Sanford Medical Center. Dr. Graff testified that, in addition to the subdural hematoma described by Dr. Jackson, A.W. had "large amount[s] of retinal hemorrhages scattered throughout both eyes . . . through multiple layers." (Tr. 362:6-11.) He explained that this kind of retinal hemorrhaging indicates that "something has

happened to the back of the eyeball on this wall" – which could be for accidental or non-accidental reasons, but "with no family history, no history of another accident that would allow for these hemorrhages to occur, it became very concerning that the cause had to be considered – what we call acceleration-deceleration, or what people call shaken baby." (Tr. 362:3-15.)  He testified that "[n]o one really understands the mechanism" for retinal hemorrhaging occurring in a non-accidental case; "[t]here are a number of theories that the eye experts use, but no one knows exactly. . . . It occurs from some type of traction or tension that causes the retinas to rupture and bleed."  (Tr. 363:3-8.)  He testified that hemorrhaging through multiple layers, as was present in A.W., is significant because "[w]hen we see multiple layers with no other medical reasons, there are only a couple things you should think of.  One is high-velocity motor vehicle accidents" – approximately four percent of children in such accidents get such hemorrhages – and the other is "some type of acceleration-deceleration of the head."  (Tr. 363:9-25.)  He said that doctors do not understand why acceleration-deceleration movement would cause retinal hemorrhaging.  (Tr. 364:3-8.)  He explained that "acceleration-deceleration" injury means "a movement in one direction, and then . . . a sudden stop and movement in the other direction.  And that fast movement, again, is taking those veins inside and stretching them to a certain point and then suddenly snapping them back in another direction."  (Tr. 374:25-375:5.)

Dr. Graff discussed the bruising he observed on A.W., which he described as "to the forehead area, and then both ears," but explained that he "can't date a bruise" or determine how it occurred by looking at it.  (Tr. 365:14-24.)  He reviewed the CT scan and observed that there was acute "blood over the right kind of curve or hemisphere of

the brain" and it "looked like it might extend back to the lower area." (Tr. 371:8-17.) He explained that "[t]his is not a subdural hematoma that I would expect from the fall.[5] Even if he had fallen right on his head, it would not be the kind of subdural I would look to see. So, now we have . . . what appears to be spontaneous new bleeding in the head which is very concerning because we have no medical reason for it." (Tr. 371:23-372:5.)

When asked if he drew "any conclusions regarding [A.W.]'s injuries" after reviewing the medical records, examining A.W., and talking to A.W.'s mother and father, he said that "there was no explanation of a medical cause or of an accidental injury that I was aware of that would allow for retinal hemorrhages, bleeding inside the head, or the bruising that I saw that was concerning" and that when "in the world of child abuse," if he "can't find a medical reason and if I can't find an accident to support the injuries I see, then I have to consider non-accidental-type injury." (Tr. 375:13-376:7.) He stated that based on the information he had, he "had no other reason, except at the top of my list is that non-accidental trauma, some type of rotational injury would be most likely the cause for what I was seeing." (Tr. 376:12-16.) He explained that "rotational injury" is "some type of . . . motion of the head and the brain and the skull" where they "don't move at the same pace and in unison." (Tr. 377:9-19.)[6] He could not, however, from the CT scan, determine whether there had been rotational injury and impact or just rotational injury,

_____

[5] It appears that Dr. Graff is referencing the specific instance in which A.W. fell out of White's hands while he was taking him out of the bathtub the night before the symptoms occurred, (see Tr. 372:6-10 (follow-up question specifically references the "tub fall")) as opposed to any type of fall generally.

[6] He later clarified that he uses "rotational injury" and "acceleration-deceleration" interchangeably. (Tr. 414:18-22.)

and he could not tell in A.W.'s case whether there had been impact (which would not necessarily have caused bruising on the skin to indicate such impact). (Tr. 378:11-25.)

He testified that with rotational or acceleration-deceleration injuries, the "insult to the brain" resulting from the motion, if severe enough, often causes children under two years of age to "stop breathing and . . . lapse into unconsciousness almost immediately." (Tr. 382:12-22.) By "immediately" he meant "[w]hen the event occurs" and explained that "[f]rom the best information we have and understand is when the event occurs, the kids, if it's severe enough, they go down immediately." (Tr. 383:9-19.) When asked if there is "a possibility that A.W. could have been suffering from bleeding on the brain for a period of time" he stated that "I don't think there's anything from the history that the parents provided that there was any mechanism or reason for him to experience bleeding. And there was nothing to suggest that his mood or his eating pattern, sleep patterns, nothing had changed that would say that he was experiencing any kind of problem with his head." (Tr. 383:23-384:5.)

With regard to the possibility of A.W.'s injuries being caused by J.S., he opined that being twisted in the Johnny Jumper would not account for the injuries because "it's not enough centrifugal force," (Tr. 388:2-18) and although twisting and hitting the door frame "might explain the bruising to the ear, depending on how he struck it and hit it," he "wouldn't expect that he is going to get the kind of subdural that he had, nor the retinal hemorrhages, and appear normal" afterward to his parents (Tr. 388:21-389:3). With regard to the cause of seizure, he explained that "[a]ny time you traumatize the brain or put blood in there, it's going to irritate the brain. The seizure can occur anywhere from almost immediately to some people speculate up to a year out. So it's a nonspecific

finding that indicates irritation to the brain. . . . [It is] secondary to something irritating the brain, such as the blood." (Tr. 390:5-13.)

On cross-examination, he clarified that his diagnosis of rotational injury is his "best estimate, with no other information provided," that "an acceleration-deceleration injury is the most likely cause for the retinal hemorrhages and the subdural hematoma at this point." (Tr. 391:21-24.) He also acknowledged that he "can't pinpoint exactly what happened or how it happened or when it happened," or put an exact time on it. (Tr. 392:20-393:6.)

### B.    Dr. Arden

White's expert was a physician and forensic pathologist named Dr. Jonathan Arden. (Tr. 436:24-25.) He reviewed the relevant medical records (including the records and notes of Dr. Jackson, Dr. Gheen, and Dr. Graff), photographs, imaging studies, and other records from the police and first responders and other agencies. (Tr. 443:8-25; 445:19-22.) Based on his review, he concluded that "A.W. had what is called a subdural hemorrhage . . . referring to bleeding in a certain location or space inside the head . . . actually on the surface of the brain. . . . So, he has a form of head trauma or head injury which," in his opinion to a "reasonable medical certainty . . . is an example of blunt impact injury." (Tr. 446:5-18.) He testified that "this is an impact injury. It happens either because something strikes the head or the head strikes something else." (Tr. 448:1-3.) He further testified that "this child actually has an adult pattern of head injury," which he explained to mean "subdural hemorrhage that is localized to one side of the head" and "infants with subdural hemorrhages . . . typically are bilateral . . . on both sides

of the head." (Tr. 448:21-449:3.) According to Dr. Arden, "the infantile pattern of bilateral, small volume subdural hemorrhages typically does not produce mass effect," or taking up space and pressing on the brain, in contrast to "what is more commonly an adult pattern," which is what Dr. Arden observed in the medical records he reviewed. (Tr. 449:17-23.) Instead, he testified that A.W. had "unilateral, one-sided subdural hemorrhage, and it has accumulated to enough volume that it is pressing on the right side of the brain to the point where it is having what was described in the radiology reports as 'mass effect.'" (Tr. 449:23-450:2.)

He explained that the subdural hemorrhage is caused by blood from vessels that break on impact, (Tr. 451:24-452:1) and that those blood vessels are very small and are veins, not arteries, so the pressure in them is quite low (Tr. 452:2-15). Because of this, he testified that "it takes time for that blood to accumulate. It doesn't happen all at once, so it takes time for the blood to accumulate. And it's the accumulation of blood which is the problem." (Tr. 453:15-19.)

In contrast to Dr. Graff, Dr. Arden opined that the brain injury was secondary to the injury to the head: "A subdural hemorrhage is, technically speaking, a head injury, not a brain injury. And if it gets big enough and it causes enough harm, it may secondarily harm the brain. But the direct effect of the impact on the head in a case like this . . . is the bleeding in that space which secondarily affects the brain." (Tr. 454:18-24.) He ruled out a "direct brain injury as a direct result of the impact to his head" because

> [t]here is no evidence of it in the initial CT scan, there's no evidence of a
> direct mechanism of brain injury in the subsequent MRI scan. There is
> clearly the evidence of the adult pattern of head injury with unilateral

> subdural hemorrhage with mass effect.  So, everything that I saw in the records and in the imaging studies as far as damage to the brain was secondary to the accumulation of the subdural bleeding.  It was not direct brain injury itself.

(Tr. 455:8-18.)   He observed that there was no evidence of brain contusions in the CT scan or MRI, "[s]o, there's absolutely no evidence that demonstrates that this child actually had a cortical contusion or any other intrinsic, primary brain injury."  (Tr. 458:3-8.)  With regard to the retinal hemorrhages, he testified that they "were also the result of the impact injury to the head, which caused the subdural hemorrhage."  (Tr. 456:15-17.)

> He then explained the impact of this opinion on the timing of A.W.'s injury:

> [W]here you have a subdural hematoma without intrinsic brain injury without direct brain injury . . . it takes time for the blood in the subdural space to accumulate. . . . [A]nd actually the interval is potentially very variable. . . . [B]ecause this is bleeding from small, low pressure blood vessels, the clinical effects, especially the serious clinical effects of a subdural hemorrhage don't happen . . .  in seconds.  In fact, it doesn't typically happen in a few minutes.  It takes time for that bleeding to accumulate to a large enough volume to cause the harmful effects.

(Tr. 458:18-459:10.)  Specifically, he testified that in an adult where the skull bones are fully fused, "it's theoretically possible for this to happen in as little as 30 minutes," but that the literature references many clinical presentations of this taking up to several hours, and even twelve to twenty-four hours, although "several hours is kind of the peak of the bell curve."  (Tr. 459:11-19.)  He concluded that thirty minutes "is kind of the lower end and several hours is the real common timeframe where this happens."  (Tr. 460:4-6.)  Furthermore, "there may not have been obvious or apparent effects during the course of the several to three hours . . . and that's particularly true in infants because the infant doesn't have the capacity to manifest or really to communicate with you that something is wrong."  (Tr. 460:11-22.)  "And so it may look like that child was pretty much normal for

the period of a couple or three hours, and then it looks like the child fell off a cliff . . . ."
(Tr. 461:14-17.)  He explained that this is in contrast to a direct brain injury, which "can
cause a child to become symptomatic very rapidly," but that "[w]e don't have that injury
here."  (Tr. 465:21-24.)

In his opinion, A.W.'s injury could have been caused by hitting his head on the
door frame while in the Johnny Jumper, because hitting his head on the door frame would
be enough force to cause the blunt trauma.  (Tr. 462:19-463:14.)  On cross-examination
he testified "there's acceleration and deceleration in every kind of head trauma
scenario . . . whether you have shaking, whether you have impact."  (Tr. 475:21-476:2.)

## VI.    OTHER TESTIMONY AT TRIAL

The government presented several other fact witnesses at trial and the Court will
recite the portions of their testimony relevant to this motion.

### A.    Cheryl Maxwell

Maxwell's testimony at trial included additional details about J.S.  She explained
that A.W. would cry when J.S. was "bothering him."  (Tr. 106:18-20.)  As an example of
"bothering" she explained that "A.W. was in a highchair one day, and he had straps going
over his shoulders and then a buckle in the middle.  My son J.S. was pulling be [sic]
those straps . . . .  And I told my son J.S. to quit doing that, and he got mad, went outside,
slammed the door."  (Tr. 106:23-107:8.)  She also explained that J.S. would push X.W.
and make him cry.  (Tr. 107:9-16.)  She also testified that the bruise on A.W.'s forehead
was from before A.W. had a seizure.  (Tr. 136:20-24.)  She explained that the bruise was
from "when my son, J.S., got mad and he threw that gun – a toy gun.  It was kind of like

a big gun, and he threw it and he hit A.W." (Tr. 137:1-5.) She testified that the incident occurred "two or three days before A.W. had his seizure." (Tr. 137:7-138:1.)

She testified that this son, J.S. had taken his father's suicide harder than his sisters did and that she had taken him to see a counselor, but that for some time he "had a mean side" and "seemed like for fun, hurt little animals" – she explained that "[o]ne time he was throwing a little cat up in the air." (Tr. 157:3-24.) She also told of a time that the neighbor boys were throwing dogs against a tree, which killed two of them, and that J.S. was with them when they did it but she did not "know if he was doing it either." (Tr. 158:1-4.) She testified that he had been mean to little kids – including having knocked out the teeth of a young girl and had thrown rocks at other little girls. (Tr. 158:4-17.) He was also mean and physical with his younger sister: "[he] would chase her around outside and sometimes he would be mean to her, like he would push her." (Tr. 158:18-21.) She also testified that the night A.W. slipped when White was taking him out of the tub, that earlier that night J.S was "pulling X.W. around by his arm." (Tr. 159:4-8.) She also testified that she heard from a teacher at school that he had been in fights there, and had brought knives to school. (Tr. 161:3-7.) She testified to other examples of his actions towards other children: he once hid a tack in the sand and had his sister "smack her hand on the sand without knowing there was a tack underneath it" and once "shoved a toothbrush" down X.W.'s throat. (Tr. 165:21-166:10.) Defense counsel introduced a picture of the "Johnny Jumper" that hung from a doorway that A.W. would sit in, and she testified that a week or two before the August 30, 2013 incident when she wasn't watching, "J.S. was messing with A.W., . . . like twirling him around." (Tr. 168:3-6; 169:3-6.)

The government asked her additional questions about what happened on August 30, including whether J.S. was alone with A.W. any time during the day on August 30, to which she answered "Um, I'm not sure. . . . I took a shower that day, and I don't know . . . because he was in and out of the house.  I don't know if he was by A.W." (Tr. 179:8-15.)  She did not recall hearing A.W. cry out at any point earlier that day and did not see J.S. hit A.W. or X.W. that day.  (Tr. 179:18-23; Tr. 187:8-12.)

### B.    Dr. Romie Tinsay

The government called Dr. Romie Tinsay, a pediatrician at the Red Lake Hospital and the primary care physician for Maxwell's children.  (Tr. 269: 21-22; 270:15-18.)  She talked about the preventative appointments at which she had seen A.W., including one on July 30, 2013 for a nine-month check-up at which he was "meeting all the milestones" and "developing at proper age."  (Tr. 279:13-22.)  She also discussed the mental health treatment of J.S. and his medication.  (*See* Tr. 288-290.)  In particular, she reviewed a medical record from J.S.'s visit to a mental health clinic visit, which stated:

> Primary behavior problems per mom and Paige include: he destroys objects at home, destroys objects at school, is fearless, is cruel to animals, bullies, doesn't improve with consequences or punishment, gets mad and walks out of class, would not do his school work; has a history of getting mad and running down the road away from the house, history of killing a puppy, and threw a kitten up in the air taunting it, swearing, kicking a boy between the legs, says 'I don't have to listen' (to his gma), when in time out he's hit the doors with a broom causing holes in the doors; Since the trial of Adderall there has been some slight improvement in inattentive, impulsive, disruptive, aggressive [sic].  Mom says [i]f he can't have his way he starts kicking whatever is near him, he has kicked the car, and put holes in the bedrooms.

(Def.'s Ex. 3.)  She explained that J.S. was treated with Adderrall, but saw little improvement with a dosage of five milligrams, so it was increased to ten milligrams but

still with little improvement, so now he is at fifteen milligrams, which has led to some improvement.  (Tr. 305:10-23.)  She stated that he was elevated to fifteen milligrams by April 2013.  (Tr. 306:8-13.)

### C.    Paige Thorson

The government also called Paige Thorson, a case manager with Red Lake Family and Children Services.  (Tr. 309:25-310:3.)  She testified that she facilitated the removal of all of Maxwell's children from her home after the incident in August 2013, which she testified was necessary at that time "because we didn't know what happened to the children . . . to A.W., and we wanted to do further investigation."  (Tr. 323:20-25.)  All four children (besides A.W.) were placed in a foster home together.  (Tr. 328:7-9.)  J.S. was there for less time than the others because the foster mother "had concerns for his mean and violent behavior towards other children in the home."  (Tr. 328:7-329:9.)  She also reported that the foster mother told her that Maxwell's oldest daughter was teasing J.S. about having hurt his younger brother.  (Tr. 330:2-4.)  She also facilitated A.W.'s placement into a therapeutic foster home in September 2013 based on his need for specialized care.  (Tr. 331:12-332:1.)

Two other witnesses testified:  Maxwell's mother and Red Lake Department of Public Safety Criminal Investigator Victoria Connor, (Tr. 257:6-7; 423:18-20), but the content of their testimony is not relevant to the issues raised by the parties in this motion.

## VII.   CONVICTION

After two and one half days of testimony, the jury returned a guilty verdict. (Redacted Jury Verdict, Mar. 13, 2014, Docket No. 63.)  White now brings this timely

motion for judgment of acquittal, arguing that the evidence was insufficient to support a guilty verdict.  (Mot. for J. of Acquittal, Mar. 21, 2014, Docket No. 65.)

## ANALYSIS

### I.    STANDARD OF REVIEW

In considering a defendant's challenge to the sufficiency of a guilty verdict, the Court views the evidence "in the light most favorable to the verdict and draw[s] all reasonable inferences in its favor."  *United States v. Vore*, 743 F.3d 1175, 1180 (8th Cir. 2014).  This standard "is strict, and a jury's guilty verdict should not be overturned lightly."  *United States v. Tate*, 633 F.3d 624, 628 (8th Cir. 2011) (internal quotations omitted).  The Court will grant the motion only if it "conclude[s] that a reasonable fact-finder must have entertained a reasonable doubt about the government's proof of one of the offense's essential elements."  *United States v. Frausto*, 616 F.3d 767, 772 (8th Cir. 2010).  "Criminal convictions may be based on circumstantial as well as direct evidence[,]" and "[i]n determining the strength of the evidence in a circumstantial case, it is the totality of the circumstances that must be weighed in making a decision on a motion for acquittal."  *United States v. Water*, 413 F.3d 812, 816-17 (8th Cir. 2005) (alteration and internal quotations omitted).

### II.    MOTION FOR ACQUITTAL

White argues that the Court should overturn the jury's verdict because there was insufficient evidence to support a finding of guilt beyond a reasonable doubt that A.W.'s injuries were caused by him.  The charge, assault resulting in serious injury under 18 U.S.C. § 113(a)(6), requires proof that (1) the White intentionally assaulted A.W., (2) as

a result of the assault, A.W. suffered serious bodily injury, (3) that the assault took place within the boundaries of the Red Lake Indian Reservation, and (4) that White is an Indian. *United States v. Stymiest*, 581 F.3d 759, 766 (8th Cir. 2009). The parties stipulated to the fact that White is an Indian and did not dispute at trial that any assault took place within the boundaries of the Red Lake Indian Reservation.

In accordance with Eighth Circuit law, the jury was instructed that "assault resulting in serious bodily injury does not require specific intent to cause serious bodily injury" and that "[a]ssault is an intentional and voluntary attempt to do injury to another person." (Jury Instruction 16, Mar. 13, 2014, Docket No. 57); *see United States v. Davis*, 237 F.3d 942, 944 (8th Cir. 2001) ("Proof of assault resulting in serious bodily injury does not require specific intent to cause serious bodily injury. Instead, it merely requires that the defendant assault the victim and that the assault happen to result in serious bodily injury," and affirming district court's use of "any intentional and voluntary attempt or threat to do injury to the person of another" as definition of assault (emphases and internal citations omitted)). Thus, to find White guilty, the jury did not need to conclude that White intended to cause A.W. harm, but rather only that he intended to undertake an action that caused A.W. serious bodily harm. *See id.* at 945 (in order to convict defendant under 18 U.S.C. § 113(a)(6) "the jury had to find that [defendant] intended to hit [the victim], but did not need to find that he intended to cause bodily harm").

## A.    Eighth Circuit Precedent

Consideration of challenges to the sufficiency of the evidence supporting a criminal conviction is a highly fact-specific inquiry. *See United States v. Coplan*, 703

F.3d 46, 72 n.29 (2d Cir. 2012) *cert. denied*, 134 S. Ct. 71 (2013) ("[S]ufficiency challenges are highly fact-specific inquiries that require a careful examination of the record."). Thus it is likely that any given case will present novel circumstances for which there is no clear precedent directing whether the evidence at trial was sufficient to establish guilt beyond a reasonable doubt. The Eighth Circuit, however, has considered sufficiency challenges to convictions under 18 U.S.C. § 113(a)(6) in very similar circumstances to those present here. These cases required, as this one did, the government to rely on circumstantial evidence to support a conviction, and offer some guidance as to what collections of circumstantial evidence are sufficient to support a guilty verdict beyond a reasonable doubt.

In *United States v. Brown*, 360 F.3d 828 (8th Cir. 2004), the defendant had been alone with her fifteenth-month-old foster son for twenty to thirty-five minutes when she allegedly noticed something wrong with him; he was taken by ambulance to the hospital where doctors observed that he had suffered from subdural hematoma, massive cerebral edema, subarachnoid bleeding, and diffuse axonal injury. *Id.* at 830-31. The parties stipulated that these injuries the child suffered were a result of "shaken baby syndrome." *Id.* at 830 n.2. The treating doctor testified that "the diffuse axonal injury, especially, would have been immediately symptomatic," as a basis for his opinion that the child "incurred the injuries after the last time that he was reported to have been behaving normally, and likely shortly before the ambulance was called." *Id.* at 831. The government's expert also testified that the diffuse axonal injury would have been immediately symptomatic, such that "the injury must have occurred shortly before [the child] was found unresponsive and comatose." *Id.*

In support of her motion for acquittal after the jury found her guilty of assault resulting in serious bodily injury under 18 U.S.C. § 113(a)(6), Brown argued that there were others who had control over the child prior to the window of time in which she had sole control. *Id.* at 832. The Eighth Circuit affirmed the district court's denial of her motion for acquittal, observing that both the treating physician and the government's experts testified that they believed the injuries were inflicted shortly before Brown called the ambulance and that even though Brown's expert testified "that he did not think it was reasonable to restrict the onset of the injuries to a specific timeframe, he nevertheless admitted that it was possible that the injury occurred" during the time window when Brown was undisputedly alone with the child. *Id.* The court also observed that the other people who Brown alleged could have caused the injuries all testified that they did not do so, and that Brown had given conflicting accounts of the child's demeanor immediately before she was alone with the child and the child's symptoms when she called for an ambulance. *Id.* at 831-32. Observing that the jury was free to discredit Brown and to credit "each expert's opinion accordingly," the court concluded that "there was sufficient evidence for the jury to find beyond a reasonable doubt that [the child] was injured shortly before the paramedics were called to the scene, and that Brown was the only person who had control over [the child] at that time." *Id.* at 832.

In *United States v. Red Bird*, 450 F.3d 789 (8th Cir. 2006), the defendant's infant son died after the defendant had been alone with her two infant sons. *Id.* at 790. The autopsy report concluded that the child died as a result of traumatic injury to the head and brain, and the jury convicted Red Bird of assault resulting in serious bodily injury under 18 U.S.C. § 113(a)(6). *Id.* At trial, the pathologist who conducted the autopsy testified

that the child had suffered subdural hematomas, subarachnoid hemorrhaging, and retinal hemorrhaging, but found no evidence of external trauma to the head which would have caused the hematomas, and concluded that the child's condition was consistent with "shaken baby/shaken impact syndrome." *Id.* at 791-92.  He testified that the injuries were not consistent with Red Bird's explanation that she had left the child alone in the bathroom, heard a thud, and returned to find him with his eyes rolled back in his head. *Id.* at 792.  Red Bird presented two experts who opined on whether a child could die "by virtue of shaking alone," or whether evidence of impact is also required to cause such fatal injuries – one stated that the medical community disagreed on this point and one opined that impact would be necessary.  *Id.*  The Eighth Circuit concluded that the government's medical testimony "provided ample grounds to believe that [the child] suffered serious injury to the brain while in Red Bird's sole custody, and that it was caused by shaken baby/shaken impact syndrome."  *Id.* at 793.  It acknowledged the disagreement between the experts on whether such a syndrome could be the sole cause of death, but did not find this dispositive because "[t]he jury was entitled to discredit [Red Bird's expert]'s testimony as inconsistent with that of the other experts," and because the jury ultimately convicted Red Bird only of assault, not homicide.  *Id.*  It also observed that evidence that Red Bird had made inconsistent statements about what had happened – both that the child had fallen down stairs and that she heard a "thud" in the bathroom – supported "an inference that she was seeking to develop an explanation to cover up her own misconduct."  *Id.*  On these bases, the court affirmed the district court's denial of Red Bird's motion for acquittal.  *Id.*

Most recently, in *United States v. Iron Hawk*, 612 F.3d 1031 (8th Cir. 2010), the defendant was home alone with his two-and-one-half-year-old daughter for about an hour, during which she began vomiting on herself and, according to the defendant, after possibly slipping and hitting her head, appeared to be choking and experiencing spells of dizziness. *Id.* at 1033-34. She was taken to the hospital in an ambulance and ultimately airlifted to a pediatric intensive care unit in Sioux Falls, South Dakota, where doctors observed subdural hemorrhaging along the right side of her head, a "mass effect" because of the hemorrhaging, and retinal hemorrhaging. *Id.* at 1034-35. Iron Hawk was charged and convicted by a jury of assault resulting in serious injury under 18 U.S.C. § 113(a)(6). At trial, the treating general pediatrician and child advocate testified that the child was the victim of non-accidental trauma, ruling out the possibility of her injury being caused by an accidental fall. *Id.* at 1035. Iron Hawk presented an expert who testified that there was both old and new blood in the subdural hematoma, leading him to conclude that there were two different episodes of bleeding and that the older subdural hematoma could have started to re-bleed as the result of a lesser force or degree of impact. *Id.* Iron Hawk argued on appeal that the evidence was insufficient to support his conviction because he had presented an alternate theory – that the child had slipped and hit her head – and because of the lack of evidence about what occurred, the jury could "only speculate" that he engaged in criminal conduct that caused the child's injury. *Id.* at 1036.

The Eighth Circuit affirmed the district court's denial of Iron Hawk's motion for acquittal. In doing so, it observed that, like in *Red Bird*, "the majority of the evidence in this case tying Iron Hawk to the assault and child abuse rests upon the testimony of medical professionals," and that the jury was "entitled to credit the testimony presented

by the government" rather than Iron Hawk's expert's contradictory testimony.  *Id.* at 1037.  Crediting the government's medical experts pursuant to the standard for reviewing a sufficiency challenge, the court concluded that "[t]he testimony from the medical professionals presented by the government provided a sufficient basis for the jury to conclude [the child]'s serious injuries were caused by Iron Hawk."  *Id.*  It pointed specifically to the testimony that the child's head injuries could not have been caused by a simple fall, that they were very recent, and that they could have been caused only by a non-accidental trauma or a high-speed motor vehicle accident.  *Id.*  It continued that the jury's "remaining inference to connect Iron Hawk to [the child]'s injury was not unreasonable in light of his sole custody during the one-hour period of time," and that any inference that could be drawn from any conflicting accounts Iron Hawk provided after the incident was "not necessary to support Iron Hawk's convictions in light of the medical evidence."  *Id.*

### B.    The Circumstantial Evidence in this Case

These cases are instructive here, given their similarities to the instant case, in which the government lacks direct evidence about what caused A.W.'s injuries, and instead has direct proof only that White was alone with A.W. for a ten-minute period when the symptoms of his injuries began.  Certainly, that alone is not enough to support guilt beyond a reasonable doubt.  But in each of the Eighth Circuit's three similar cases, the evidence included other pieces of circumstantial evidence in addition to the defendant being alone with the child: medical testimony strong enough to support a reasonable inference that the child's injuries must have occurred during the period in which the

defendant was alone with the child, testimony ruling out any other alternate theories as to the cause of the injuries, and inconsistent accounts by the defendant giving rise to an inference that the defendant was covering something up.  In those cases, these pieces of circumstantial evidence together amounted to sufficient evidence to support a conviction beyond a reasonable doubt.  *Cf. United States v. Kelton*, 519 F.2d 366, 367 (8th Cir. 1975) (instructing that "the several facets of the case against the defendant are not to be isolated, each from the others, in determining whether a case for the jury has been established," but rather, "[w]here the proof of the prosecution is circumstantial it is the totality of the circumstances that must be weighed in making a decision on a motion for acquittal").

The Court thus must consider whether, drawing all reasonable inferences in the government's favor, the circumstantial evidence here was sufficient in total to support a conviction beyond a reasonable doubt.  The government argues that several pieces of circumstantial evidence support the conviction here: testimony regarding the timing of the onset of symptoms, the possibility of alternate causes, and the defendants' statements about what occurred.  The Court concludes that these pieces of circumstantial evidence are too weak, even in their totality, to support a finding of guilt beyond a reasonable doubt.

### 1.    Timing of the Event Causing Injury

Much of the evidence regarding the potential timing of what caused A.W.'s injuries is medical testimony from treating physicians and medical experts.  The Court will take all inferences in the government's favor – assuming that the jury credited the

government's medical witnesses and expert – in considering whether the medical testimony supported a finding beyond a reasonable doubt that the cause of A.W.'s injuries must have occurred during the period that he was alone with White. *See United States v. Molina-Perez*, 595 F.3d 854, 859 (8th Cir. 2010) (courts must "view[] the evidence in the light most favorable to the jury verdict and giv[e] the verdict the benefit of all reasonable inferences"); *Brown*, 360 F.3d at 832 ("the jury was free to credit each expert's opinion" in a manner favorable to a verdict).

Dr. Jackson, the staff neurosurgeon who treated A.W., testified that he observed "acute" subdural hemorrhaging, which he explained meant that the blood was new and not chronic, and would have been deposited anywhere from three hours to three days after the injury causing the bleeding.  (Tr. 197:16-20.)  He explained that while the blood is collecting, an adult might complain of a headache, but that "it's difficult to tell that an infant has a headache.  It may not be seen as quickly in an infant."  (Tr. 198:3-10.)  He later testified that a subdural hematoma can cause a seizure "at the time of the injury, all the way out to for the rest of the individual's life because of the underlying head injury." (Tr. 205:16-19.)  On cross-examination, he testified that an infant could act normal for a period of time after an injury if the pressure is gradually building, but that the slow-building pressure is usually found in adults.  (Tr. 211:10-17.)

Child abuse expert Dr. Graff also testified about the timing of the injury.  He testified that in his best estimate A.W.'s seizures and unconsciousness were not caused by the subdural hemorrhage, but rather from acceleration-deceleration motion, and "if there's this rotation and there's a stretch injury . . . then what we see is those kids go down, and that appears immediately," which he clarified to mean "[w]hen the event

occurs." (Tr. 383:1-11.)  When asked if there is "a possibility that A.W. could have been suffering from bleeding on the brain for a period of time" he stated that "I don't think there's anything from the history that the parents provided that there was any mechanism or reason for him to experience bleeding.  And there was nothing to suggest that his mood or his eating pattern, sleep patterns, nothing had changed that would say that he was experiencing any kind of problem with his head."  (Tr. 383:23-384:5.)  He acknowledged that "[y]ou can have blood that's collecting and you may see – early on, you may see nothing.  But you may see with time irritability, vomiting, again depending on the severity of the injury and what caused it," (Tr. 384:9-12), but opined that given the extent of the injuries he observed, he would have expected to see "a change in the infant noticed by the parents" (Tr. 384:22-24).  Again, based on what he heard from A.W.'s parents about possible causes of the injury, he testified that "[t]he fact that this infant was reported to be down in that brief period of time when he'd been doing perfectly fine, then I would expect that whatever caused that injury had to occur just prior to him going down."  (Tr. 387:11-14.)  On cross-examination he acknowledged that it was reasonable to say that he could not "pinpoint exactly what happened or how it happened or when it happened," and that he could not give an exact time of when any event causing A.W.'s injuries occurred.  (Tr. 392:20-393:6.)

This testimony certainly supports an inference that the event causing A.W.'s injuries occurred immediately before White observed the symptoms.  Still, taken at face value, this testimony is not as certain or strong as the timing testimony in *Brown*.  In *Brown*, both of the government's medical witnesses' testified that based on the specific injuries the child sustained, the child would have shown symptoms immediately and

would not have behaved normally after the injuries, and there was no mention of any testimony acknowledging that it would have been possible for the child to behave normally for some time after the event causing the injury as there was from both Dr. Jackson and Dr. Graff.   (*Compare Brown*, 360 F.3d at 831, *with* Tr. 197:16-20; 384:9-12.)   More critically, the medical witnesses' testimonies in *Brown* that the injuries would have been immediately symptomatic were based specifically on the child's "diffuse axonal injury" – an injury that A.W. did not have.   *See Brown*, 360 F.3d at 831 (treating physician testified that "the diffuse axonal injury, especially, would have been immediately symptomatic," and expert testified that "the diffuse axonal injury would have been immediately symptomatic").

Thus, treating the government's medical testimony in each case as having been believed and credited by the respective juries, the face value of the medical testimony in *Brown* results in a much stronger inference that the injury-causing event **must** have occurred during the relevant time period than does the medical testimony in this case. Dr. Graff opined that the symptoms would have occurred immediately, but his opinion was based in part on the lack of anything else that he was aware of in the timeline that could have caused the symptoms rather than based solely on medical causation, and he ultimately acknowledged that he could not state precisely when the injury occurred. Given the narrow timeframe in which White was alone with A.W. – only ten minutes – Dr. Graff's lack of certainty leaves open the possibility that the injury occurred before White was alone with A.W.   Thus, this piece of circumstantial evidence – medical testimony placing the injury in the relevant timeframe – although present in this case, is much weaker than in *Brown* and does not on its own support an inference beyond a

reasonable doubt that the cause of A.W.'s symptoms occurred during the ten-minute period in which he was alone with White.  *See* Model Crim. Jury Instr. 8th Cir. § 3.11 (2011) ("A reasonable doubt is the kind of doubt that would make a reasonable person hesitate to act.  Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it."); *see also United States v. McCraney*, 612 F.3d 1057, 1063 (8th Cir. 2010) (observing that the Eighth Circuit has repeatedly "upheld the constitutionality of Model Instruction 3.11").

### 2.    Alternate Theories

*Brown*, *Red Bird*, and *Iron Hawk* also included circumstantial evidence that effectively ruled out alternate theories proposed by the defendant, which supported guilty verdicts against those defendants given the totality of the circumstances.  For example, in *Red Bird*, the issue was not whether the injury occurred in the timeframe in which Red Bird was alone with the child, but whether the injury could have been caused by alternate explanations Red Bird proposed that allegedly occurred during that timeframe:  the "thud" in the bathroom or falling down the stairs.  *Red Bird*, 450 F.3d at 791-93.  The government's medical witness opined that the child's head injuries were not consistent with her explanations, and the rest of the court's discussion of the expert testimony focused on the differences of opinion over whether shaking an infant could cause death, which the court concluded was not dispositive because the jury convicted Red Bird on only the assault charge, not the homicide charge.  *Id.* at 792-93.  Similarly, in *Iron Hawk*, the court observed that "[f]our different medical doctors . . . testified that [the child]'s

serious head injuries could not have been caused by a simple fall," a theory presented by the defendant at trial.  *Iron Hawk*, 612 F.3d at 1037.

In contrast, the strongest medical testimony in support of the government's theory of an acceleration-deceleration shaking injury is Dr. Graff's testimony that the symptoms were consistent with such an injury, (Tr. 379:1-4) but he could not determine whether there had been an impact injury (Tr. 378:11-25).  Further, he did not opine, as the doctor did in *Red Bird*, that A.W.'s injuries were **inconsistent** with all of the alternate theories proposed by White, specifically that J.S. could have inflicted the injuries at some point during the day on August 30.   (*See* Tr. 390:19-391:4 ("I can't make a comment on [whether it is possible that J.S. could have caused A.W.'s injuries]. . . . [T]o the best of the medical community's knowledge at this point, we don't have good information that an 8-year-old can generate those kind of injuries.  But we have limited experience.").)[7] As with the timing issue, the medical testimony here, taken as true, does not support a strong inference of guilt beyond a reasonable doubt.

The court in *Brown* found it significant that, although Brown's theory was that others could have inflicted the injuries upon the child, all of the people who could have possibly been in a position to do so (before the relevant time period in which Brown was alone with the child) testified that they did not.  *See Brown*, 360 F.3d at 832.  Here, there was no testimony from J.S. or anyone else stating that J.S. did not injure A.W. from

---

[7] Although Dr. Graff testified that the injuries could not have been caused by twisting in the Johnny Jumper and hitting the doorframe, his conclusion to this extent was actually more limited:  he testified that he would not expect that A.W. would appear normal to his parents after hitting the door, (*see* Tr. 388:19-389:3), but this testimony does not indicate that it is Dr. Graff's opinion that hitting the doorframe could not medically cause the injuries A.W. suffered.

which a jury could discredit this theory.  The government points to Maxwell's testimony that she did not hear A.W. cry out or see J.S. hurt A.W. during the day on August 30, but that does not as strongly support an inference that it did not happen as the direct denial testimony in *Brown*, which the court deemed to be a significant piece of circumstantial evidence in favor of guilt.  This is especially the case given Maxwell's testimony that her children were in and out of the house that day and that she took a shower, leaving open the possibility that J.S. took some sort of action against A.W. causing these injuries without her observing it.  The most the jury could have concluded from this testimony is that during the periods of time which Maxwell actually observed A.W., J.S. did not inflict any injuries upon him.  Furthermore, a government witness presented testimony suggesting affirmatively that J.S. had caused the injury:  case manager Paige Thorson testified that J.S.'s foster mother told her his older sister was teasing him "that [J.S.] had hurt his younger brother," (Tr. 330:2-4), and there does not appear to be any reasonable basis, and the government has not presented any, for the jury to have discredited this piece of circumstantial evidence.  Given the extensive testimony of the challenges facing J.S. and the tendency for those challenges to manifest in violence toward people and animals around him, including A.W., White's alternate theory is much stronger than those in *Brown*, *Iron Hawk*, and *Red Bird*.[8]  Unlike in those cases, the discrediting of

---

[8] Further strengthening White's alternate theory, in comparison to the defense theories in the other cases, is the unequivocal testimony from White's expert Dr. Arden that the injury could not have occurred immediately before the onset of symptoms.  (*See* Tr. 459:11-19.)  Dr. Arden's testimony was clear that the subdural hemorrhage would have been caused by blood from small, low-pressure veins pooling in the brain, and that it would have taken at least thirty minutes for enough blood to pool in order to cause symptoms of the injury.  (*See* Tr. 452:2-15, 453:15-19, 460:4-6.)  In contrast, the defense expert in *Brown* testified that he did not think it was

(Footnote continued on next page.)

alternate theories is not an additional piece of circumstantial evidence in support of a guilty verdict.

### 3.   Inconsistent Statements by Defendant

Another piece that the Eighth Circuit found supportive of a guilty verdict in *Brown* and *Red Bird*, and which the government argues is present here, is inconsistency in the statements by the defendant about what occurred on the day of the injury.   The court observed in *Red Bird* that "[e]vidence that Red Bird gave changing statements about the circumstances of the incident . . . also supports an inference that she was seeking to develop an explanation to cover up her own misconduct." *Red Bird*, 450 F.3d at 793. Similarly, in *Brown*, the court observed that "[t]he government also presented evidence of the conflicting accounts given by Brown, and that evidence may well have affected her credibility in the jury's eyes." *Brown*, 360 F.3d at 832.

In contrast, White told the same account of what occurred when he was alone with A.W. on August 30 on several occasions.   Officer Ybarra testified that when she arrived on the scene White suggested that A.W. could have been choking on "a cigarette butt or the hamburger . . . he had been fed earlier."  (Tr. 41:2-5.)  Maxwell testified that when she returned from her cousin's house that White opened the door and asked for her help

---

(Footnote continued.)

reasonable to restrict the onset of the injuries to a specific time frame, "he nevertheless admitted that it was possible that the injury occurred" during the time period when Brown was alone with the child. *Brown*, 360 F.3d at 832.  This stronger defense expert testimony bolsters the viability of alternate theories here as compared to *Brown* and other cases, further demonstrating that the lack of a viable alternate theory is not an additional piece of circumstantial evidence supporting a guilty verdict in this case.

because A.W. was choking and that he also said "that he found a little cigarette filter in his mouth." (Tr. 119:6-15; 122:3-8.) He told a similar story to social worker Valerie Hanson that "he thought the child was choking, and so he felt like he was trying to sweep the mouth and out came a cigarette butt. And then he said the child's – there was food starting to come out of his mouth, and the eyes were kind of rolling back, and so he thought he was choking" and that Maxwell "came home at that time and that's when they called 9-1-1." (Tr. 227:14-20.) He again told a similar story in his interview with Dr. Graff: Dr. Graff testified that White explained, among other things, that when Maxwell left he "heard some gasping, went in to check and see what was going on with the infant" and did "a finger sweep and found a cigarette butt in the infant's mouth . . . went outside, saw the mother, urged her to call 9-1-1, and then law enforcement showed up." (Tr. 359:22-360:6.) In contrast to the defendant in *Red Bird*, who told hospital workers that she heard a "thud" in the bathroom but told her neighbor the child fell down the stairs, or the defendant in *Brown* who initially said that the child was crying before the incident but later said that he was not and gave conflicting accounts about whether the child was limp or shaking when she called the ambulance, White's accounts to various people of what occurred in the moments surrounding the onset of symptoms are consistent.

The government points to his statements about other possible causes as inconsistent statements permitting an inference that he sought to cover-up wrong-doing. He told Valerie Hanson that it could have possibly have been J.S. because he was "very rough on the other two youngest children," and mentioned that J.S. had thrown a toy at A.W.'s head and that J.S. would swing A.W. in his Johnny Jumper, sometimes hitting

against the door frame.  (Tr. 228:8-19; 229:1-4.)  He also told Hanson about the bath incident: she testified that he said that he had given "the child a bath like a Thursday or a Friday night before; he had accidentally dropped him, where the child hit the left side of his body."  (Tr. 227:3-8.)

He similarly told Dr. Graff about his concerns about J.S. and the bath incident. Dr. Graff testified that White "expressed some concerns about the older son . . . about [him] potentially choking the infant and dragging him around."  (Tr. 359:7-9.)  Dr. Graff also testified that "[h]e said he had washed the infant off.  There was probably still some soap on because he hadn't rinsed him off completely.  He was taking him out.  The infant started to slip, so he grabbed the leg and supported the buttock area but the infant caught his chin on the tub edge and then kind of rolled onto the floor."  (Tr. 360:9-15.)  This was consistent with what Maxwell separately told Dr. Graff in her interview with him: "that A.W. was in kind of a Johnny Jumper and an older sibling had – must have wound it up a little bit and let it twirl and that the patient had hit his head on the door jamb," (Tr. 354:24-355:4), and that White had "indicated that while giving the infant a bath and taking him out, he started to slip and fall and that he had struck part of his head on the tub, but that he had been fine since that time" (Tr. 355:9-13).

These statements to Hanson and Dr. Graff were not explanations of what **did** occur on August 30 surrounding A.W.'s symptoms, but rather possible explanations of what **could have** occurred upon questioning by medical and social work professionals who sought to understand what could have caused A.W.'s injuries.  This sort of hypothesis generation is not the same as changing one's story about the details or circumstances of what actually occurred during a particular episode.  Furthermore, the

possible explanations he generated were consistent regardless of who he told, and consistent with the possible explanations Maxwell gave Dr. Graff independently. Thus, unlike in *Red Bird* and *Brown*, the trial testimony did not include inconsistent statements made by the defendant to add to the totality of circumstantial evidence of guilt.

Considering the totality of the government's evidence, the Court concludes that, beyond the fact that White was the only person with A.W. during the onset of his symptoms, the only other piece of circumstantial evidence in support of his guilt is the medical testimony from Dr. Graff and Dr. Jackson that they expected that the symptoms would have occurred immediately following the injury. But, as explained above, even if the jury fully credited this medical testimony, it does not give rise to as strong of an inference of guilt as in other similar cases, and does not indicate that the injury **must** have occurred during that period. Without additional evidence undermining White's alternate theory that J.S. could have caused the injuries or of actions by White suggesting that he sought to cover up his own misconduct, as was present in *Red Bird*, *Iron Hawk*, and *Brown*, the evidence presented by the government at trial would require too much speculation, rather than reasonable inferences, to find beyond a reasonable doubt that White intentionally injured A.W. *Cf. United States v. Pace*, 922 F.2d 451, 453 (8th Cir. 1990) ("While reasonable inferences from the evidence weigh against the defendant, speculation does not.").

Although the medical testimony alone was sufficient to support affirming the denial of a motion for acquittal in *Iron Hawk*, the medical testimony there needed to do less work than the medical testimony must do here – it needed only to refute Iron Hawk's submission that the child's injuries were caused by a fall. In contrast, given the

possibility of other causes for A.W.'s injuries – J.S. – and the very short timeframe in which White was alone with A.W., the government's medical testimony needed to support an inference beyond a reasonable doubt that the cause of A.W.'s injuries occurred in that ten-minute timeframe.  Although he testified that he would expect the symptoms to occur immediately, Dr. Graff conceded that he could not say when the injuries occurred.  That level of certainty may suffice if the defendant had been alone with A.W. for an extended period, such as the half hour in *Brown* or hour in *Iron Hawk*, but the ten-minute period here leaves much less room for a margin of error.  Without being able to limit, beyond a reasonable doubt, the timing of the injury to the ten minutes in which White was alone with A.W. or to refute alternate causes of the injury, the government's medical testimony here leaves open the possibility that A.W.'s injuries were caused by another person or in another manner.

Even taking all reasonable inferences in favor of a guilty verdict, the government's evidence at trial amounted to the fact that the symptoms occurred during a ten-minute period in which White was alone with A.W. and equivocal expert testimony that the symptoms likely would have occurred immediately following the cause of the injury.  Given the equivocation of the medical testimony on timing, the plausible alternate explanations, and the narrow timeframe in which the government needed to prove that the injuries occurred, the Court concludes that a "reasonable fact-finder must have entertained a reasonable doubt" as to whether White caused A.W.'s injuries.  *See Frausto*, 616 F.3d at 772 (internal quotations omitted).  The Court thus concludes that the evidence was insufficient to support White's conviction beyond a reasonable doubt.

The Court is extremely hesitant to overturn the verdict of a jury. However, in this case, justice requires an acquittal. A conviction must be supported by evidence beyond a reasonable doubt. Here, the evidence is simply insufficient. The Court finds James White, Jr. to be not guilty and that the jury's verdict must be overturned.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Judgment of Acquittal [Docket No. 65] is **GRANTED**. The U.S. Marshal is ordered to release the Defendant from custody.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  June 2, 2014                          _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                United States District Judge